(C. D. 1471)

CLEMENTS PAPER COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 23, 1952)

*Levine and Levine* (*Wendell H. Levine* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*John J. McDermott* and *Joseph E. Weil*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an action to recover duties alleged to have been erroneously assessed against an importation of paper from Canada. The collector of customs at Memphis, Tenn., the port of entry, classified the importation within the provisions of paragraph 1409 of the Tariff Act of 1930, as modified by the trade agreement with Finland, 70 Treas. Dec. 369, T. D. 48554, as wrapping paper, not specially provided for, other than sulphate, and accordingly assessed duty thereon at the rate of 25 per centum ad valorem. The sole claim of the plaintiff in this suit is that the merchandise is uncoated printing paper, not specially provided for, dutiable at the rate of one-fifth of 1 cent per pound and 5 per centum ad valorem, in accordance with the provisions of paragraph 1401 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

The first hearing in the trial of this cause was held at Nashville, Tenn., at which time four witnesses testified on behalf of plaintiff. Each of these was well qualified in his field, having had many years of experience in the handling of either printing or wrapping paper, or both. Witness Charles H. Williams, vice president and general manager of the Clements Paper Company, the importer herein, had been engaged in the handling of both printing and wrapping papers, and their sale and distribution throughout a large area in the South, for 31 years. A. S. Ghertner, president and active manager of Cullom & Ghertner Printing Co. of Nashville, Tenn., the firm which purchased and used the paper at bar, had been in the printing business at least 20 years. He testified that he began his printing career as a very young boy and had actually been in the printing plant for several years before attaining his present position. Witness C. A. McClendon is a paper and "wooden" weigher who for 40 years has been engaged

in the sale of wrapping paper, and witness A. V. Kirkpatrick, presently the manager of the industrial or coarse paper department of plaintiff company, had been associated with that firm for 30 years, and was for the period of that association familiar with both printing and wrapping papers.

It appears from the testimony of these witnesses that the paper at bar, a sample of which was received in evidence as plaintiff's exhibit 1, was ordered by plaintiff company from a Canadian manufacturer to fill an order for such paper placed with plaintiff by the Cullom & Ghertner Printing Co. The order specified a paper with prescribed dimensions and a minimum sulphite content of 70 per centum, which would meet a Mullen test of 16 points. Except for the Mullen-test requirement (a test for determining the tearing point of paper), the invoice description of the merchandise, deemed in evidence as plaintiff's exhibit 4, but not so marked, tallied with the order.

The paper, as imported, complied in all respects with the specifications except for the fact that it showed a slight decrease in Mullen test, which would have the effect of decreasing the tearing strength of the paper. The variation was so slight, however, that the order was accepted as satisfactory by the Cullom & Ghertner Printing Co.

It further appears that for 25 years or more, plaintiff has purchased both in the United States and in Canada for sale to Cullom & Ghertner Printing Co., paper similar to plaintiff's exhibit 1, which was used by the latter for printing waybills, bills of lading, and other types of forms for every railroad in the Southeast, many in the East, and quite a few in the West and Southwest. Types of forms so printed are in evidence as plaintiff's collective illustrative exhibit 2. According to the witness Williams, this paper is designated in the trade as "waybill, cream waybill, some people call it low sulphite."

All of plaintiff's witnesses were agreed that paper of the type here involved was a printing, not a wrapping paper. It was their unanimous opinion that wrapping paper is much stronger, coarser, and somewhat less expensive than paper such as exhibit 1. It would not tear as readily as plaintiff's exhibit 1 and would be a more attractive sheet. Typical pieces of wrapping paper are in evidence as plaintiff's collective exhibit 6. It was possible, the witnesses admitted, to use paper like exhibit 1 for wrapping an article like a tie, for example, but primarily and principally such paper was used, and had long been used, as printing paper. In the words of the witness Williams, for printing purposes you need a paper—

* * * that would be made to be able to run on printing presses. * * * Up-to-date printing presses are very high speed presses. You have to have a sheet that is not forced, and also a sheet that has a proper filler so that the sheet will be even, and what we call dense and will be able to take printing. * * *

This witness further stated:

\* \* \* in making wrapping paper, you would make a sheet with a long fibre to give it strength, and it would be a rugged or a bumpy sheet, would have a smooth printing surface, but when you make a sheet for printing purposes, you have to add a certain amount of short fibre or filler to bind those fibres together and make what we term as a dense sheet to eliminate pin holes in a sheet of paper so that it will run on the presses, and also a sheet that will print, and that the type will show up under printing presses.

Other characteristics considered by these witnesses as bearing upon the determination of whether paper is printing paper, such as cream waybill paper, are its sulphite content, its smoothness, evenness of finish, strength, and uniformity in condition. In their opinion, the imported paper met these requirements. It was also trimmed squarely to operate at the maximum efficiency of the automatic high-speed presses of Cullom & Ghertner Printing Co., and was, in fact, actually used by that company for printing waybills and other railroad forms. It was not, however, ever used for printing books or magazines.

At the conclusion of plaintiff's case, counsel for defendant asked the court to direct that a sample cut from plaintiff's exhibit 1 be sent to the chemists' laboratory in New York for analysis. It is of some significance that, despite this request, no chemist's report was subsequently moved in evidence by defendant, and it does not appear of record that defendant submitted the sample to the United States chemists at New York for analysis. Whatever inference may be drawn from the Government's failure to act in this respect must certainly inure to the benefit of plaintiff. Clearly, it may be assumed that had an analysis in fact been made, its results would have tended to support the position taken by the plaintiff to the effect that the merchandise at bar lacked sufficient strength and possessed those properties which would make it unfit for use as wrapping paper.

Counsel for defendant also moved the court for permission to take the testimony of six witnesses on written interrogatories for the reason that these witnesses resided or maintained their places of business outside of the jurisdiction of Nashville, Tenn. Upon motion granted, commissions were issued, and the depositions of the said six witnesses were taken and, thereafter, offered in evidence at a continued hearing of this cause.

Although the witnesses for the defendant appear to have been as well qualified and experienced in the field of wrapping and/or printing papers, as were those who testified in behalf of plaintiff, there was by no means the same degree of unanimity of opinion as to what kind of paper exhibit 1 might be as existed amongst the witnesses for plaintiff. Wiley L. Jennings, with 16 years' experience in the manufacture and distribution of pulp and paper, was of opinion that plaintiff's exhibit 1 was a wrapping paper, chiefly used in the butcher's wrapping field—

\* \* \* because of the apparent minimum degree of beating (hydration); its long fiber length, its lack of good felting and formation characteristics, its relative degree of roughness of the surface—all of the above characteristics being that of a typical wrapping paper.

It was his belief that exhibit 1 differs from uncoated printing paper to a very marked degree—

\* \* \* in that it is very poorly felted, has very large fiber bundles in its formation, which in turn give it a very unhomogeneous printing surface, which would, in turn, make it selectively ink receptive (printing inks). Uncoated printing paper, in my experience, contains a marked degree of filler over that which is apparent in this sheet; also, printing paper is not normally sized to the extent of Exhibit 1.

This witness had not, however, seen or handled waybills, bills of lading, and other similar railroad documents, and was, for that reason, unable to state whether those forms were printed on a type of paper similar to plaintiff's exhibit 1.

Witness F. Henry Savage, with 29 years' experience with printing and writing papers, who had for a short time, 25 years previously, handled wrapping paper, considered plaintiff's exhibit 1 to be an uncoated printing paper, primarily used for printing purposes. He was familiar with waybills, bills of lading, and the like, which he had seen and handled on innumerable occasions, and stated that they are generally printed upon papers very similar to that represented by exhibit 1, which has the same characteristics as waybill print type paper and could be called a waybill paper.

Paul A. Mahoney had 19 years' experience in the manufacture and sale of paper, his contacts being primarily in the printing paper field. He had a slight knowledge of writing paper; none whatsoever of wrapping paper. He thought exhibit 1 would be a coarse printing paper or a wrapping paper but not a writing paper. From his frequent observation and handling of waybills and other railroad forms, he was able to state that such forms are often printed on paper of the type of plaintiff's exhibit 1, although it was his belief that other grades of paper more receptive to printing ink are also very extensively used for waybills and bills of lading.

H. M. Annis, who testified that his experience in the printing paper field goes back to the middle 1920's, thought that plaintiff's exhibit 1 was more typically a writing paper than a printing paper, because it is coarsely formed, tinny and brash, strong, and apparently made of a high percentage of long fiber. It was his belief that it would be chiefly used as a low-grade writing paper or a specialty converting paper.

George J. Smart had been in the writing and printing paper business for 16 years, and thought that exhibit 1 would qualify as uncoated printing paper—

\* \* \* because it lacks the strength and other characteristics usually found in wrapping papers; because it has not the appearance, cleanliness, or other

qualities which would make it suitable for writing paper purposes; and because its surface and other characteristics would make it suitable for certain types of low grade printing.

He had frequently seen and handled railroad waybills and was of opinion that they are generally printed upon paper of a similar type to exhibit 1.

Edward G. Murray, with 19 years' experience in the manufacture of printing papers, thought that exhibit 1 was either a writing or a wrapping paper, not a printing paper, because of strength, tear, open formation, lack of cleanliness and color, long fibers, rough surface, and hills and valleys in the surface. However, when asked his opinion as to what would be the chief use of such paper, he stated, "In my opinion, its chief use is as a waybill manilla or it could be used as a pattern paper."

We observe from the foregoing that despite the disparity of conclusions reached by defendant's witnesses as to the appropriate classification of the instant merchandise, those witnesses who were familiar with waybills, bills of lading, and other railroad forms, admitted frankly that such forms were on frequent occasions printed upon paper similar to plaintiff's exhibit 1. These admissions, coupled with plaintiff's proof that for a period of about 25 years, paper similar to that at bar was sold, and actually used, in the printing of such forms for railroads operating throughout a vast area in the United States and that it was known as waybill paper, establish for the purposes of this case that the instant importation was of a class of paper used for printing purposes.

The weight of the evidence also preponderates in favor of plaintiff's contention that the instant merchandise is not wrapping paper, as classified by the collector. It lacks that degree of strength, coarseness, and attractiveness, which ordinarily characterizes wrapping paper, and is more expensive than papers used primarily for wrapping purposes. For these reasons, it would not be acceptable to the trade as wrapping paper.

Of course, the provision in paragraph 1401, as modified, *supra*, is an *eo nomine* designation, suggestive of use, and may be said to refer only to that class of uncoated papers which, as of June 17, 1930, was chiefly used in the United States for printing. There is in this record, in our opinion, sufficient proof to establish that the instant paper satisfies the requirements of the statute, insofar as its relationship to a category of papers chiefly used for printing purposes as of that date is concerned, in that it affirmatively appears that for a period of about 25 years prior to the hearing in December 1949, similar paper had been sold for the printing of railroad forms, and that plaintiff's exhibit 1 possessed generally the same characteristics as waybill-type printing paper.

Upon the issue of whether or not the paper at bar is uncoated, there is some affirmative evidence introduced by defendant that exhibit 1 is an "uncoated printing paper" and even those of defendant's witnesses who considered that exhibit 1 differed from uncoated printing paper based their points of distinction, not upon any suggestion that the paper was coated, but rather upon the fact that the paper did not conform with their individual opinions of the requirements of printing paper. Moreover, to the lay eye, the sample of paper received in evidence as representative of the importation has no appearance of coating.

Accordingly, we find that plaintiff has sustained the burden of proof which it was called upon to assume and that the merchandise at bar is properly dutiable within the provisions of paragraph 1401 of the Tariff Act of 1930, as modified, *supra*, at the rate of one-fifth of 1 cent per pound and 5 per centum ad valorem, as uncoated printing paper, not specially provided for. The claim in the protest to that effect is sustained.

Judgment will be entered accordingly.