(C.D. 4196)

De Vahni International, Inc. *v.* United States

## United States Customs Court, First Division

(Decided April 2, 1971)

*William R. Shapiro; Barnes, Richardson & Colburn,* associate counsel (*James S. O'Kelly* and *Irving Levine* of counsel) ; for the plaintiff.
*L. Patrick Gray, III,* Assistant Attorney General (*Herbert P. Larsen* and *Susan C. Cassell,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The merchandise in these consolidated protests consists of leather sandals imported from India during the period between June 6, 1966 and March 7, 1968. The legal question presented pertains to their proper classification for customs duty purposes. They were classified under item 700.40 or 700.41 [1] of the Tariff Schedules of the United States as footwear for persons other than men, youths, and boys, and were therefore assessed with duty at the rate of 20 per centum ad valorem, or at the rate of 18 per centum ad valorem.

Plaintiff claims that the sandals are legally properly classifiable under item 700.35 as footwear for men, youths, or boys, with duty at the rate of 10 per centum ad valorem.

The following are the pertinent provisions of the Tariff Schedules of the United States as found in schedule 7, part 1:

"SUBPART A.—FOOTWEAR

Subpart A headnotes:

\* \* \* \* \* \* \*

2. For the purposes of this subpart—

\* \* \* \* \* \* \*

(f) the term <u>footwear for men, youths, and boys</u> (item 700.35) covers footwear of American youths' size 11½ and larger for males, and does not include footwear commonly worn by both sexes; and

\* \* \* \* \* \* \*

Footwear, of leather (except footwear with uppers of fibers) :

\* \* \* \* \* \* \*

---

[1] Three of the involved protests, namely, 68/37652, 68/37653, and 68/29313 relate to entries made after January 1, 1968, the effective date of item 700.41 which superseded item 700.40.

| | | | |
|---|---|---|---|
| | Other: | | |
| 700.35 | For men, youths, and boys_____ | 10% ad val. | |
| * | * * * * | * | * |
| 700.40 | For other persons_____ | 20% ad val. | |
| * | * * * * | * | * |
| | For other persons: | | |
| 700.41 [2] | Sandals of buffalo leather, the uppers of which consist primarily of straps across the instep and big toe _____ | 18% ad val." | |

Plaintiff contends that the sandals in question are not commonly worn by both sexes, but have been designed for men, are sold to men, and are worn by men. To substantiate these claims, plaintiff has offered the testimony of six witnesses, all of whom have had extensive experience in the manufacture, distribution and sale of men's shoes. Plaintiff also introduced into evidence 13 exhibits each of which consisted of a pair of sandals and the box in which it was contained. Each box was clearly marked with the style and size numbers of the sandals contained therein.

Plaintiff's exhibits 1 through 7, representative of those sandals in issue, were samples of styles of style 981–M in men's sizes 7 through 13, respectively. Plaintiff's exhibits 8 through 13 were samples of style 400–L in ladies' sizes 5 through 10, respectively. Each of the sandals bore the size number corresponding to the size on the box wherein contained. In plaintiff's exhibit 7, the sandals also bore the number 981–M which corresponded to the style number appearing on the box containing them.

While the testimony and exhibits refer to only one style of men's sandal covered by the entries and invoices before the court, namely, style number 981–M, the parties have stipulated that it is typical of all other style numbers which bear the suffix "M" and which have been similarly classified under items 700.40 or 700.41 of the Tariff Schedules of the United States.

The sandals are manufactured by hand in India from the hides of the water buffalo. Mr. Nat Dorfman, president of De Vahni International, Inc., the plaintiff in this action, testified that he was the buyer of the sandals in question, and was quite familiar with their manufacture and design.

The sandals were originally designed and manufactured in Italy, but plaintiff obtained a set of patterns and distributed copies to the

---

[2] Effective January 1, 1968, this provision superseded item 700.40.

manufacturers in India. The workers would place the pattern on the leather, outline it in pencil, and then cut out the pattern by hand. The sandal consists basically of a leather sole, a loop for the big toe, and a woven leather strip that goes from one side of the sandal near the rear portion to the other side and comes over the instep.

The design and manufacture is the same for both sandals designated 981–M (plaintiff's exhibits 1–7), and 400–L (plaintiff's exhibits 8–13).

It was stated that the suffix "M" on the invoices stands for men's and the suffix "L" stands for ladies'. The numbers and suffixes are taken from the original patterns and are not assigned by plaintiff.

While in appearance, both 981–M and 400–L are alike, in size and shape they are different. As was demonstrated in open court, a comparison of a size 9 sandal of the two styles clearly shows that the men's sandal is substantially longer and wider. A man wearing a size 9 shoe could not wear a size 9 sandal of the ladies' style 400–L. The men's sandals come in sizes 7 to 13, while the ladies' sandals run from sizes 5 to 10.

The 981–M sandal is sold primarily to men's shoe stores, and the 400–L sandal is sold mostly to women's shoe stores. In some department stores, where there is only one shoe buyer, both styles will be ordered together though the sandals will be sold in separate departments according to their designation of "M" or "L".

Mr. Dorfman stated that at his place of business he also maintains a retail store from which he has sold several thousand pairs of the sandals here in question. With rare exception, all such sandals were sold for men. He observed that perhaps no more than one sale in a hundred was made to a woman, and that was when the woman had extraordinarily large feet and could not wear a sandal with an "L" designation.

Plaintiff's other witnesses substantiated Mr. Dorfman's testimony, stating that they had rarely seen a woman buy a water buffalo sandal with the suffix "M", and, when one did, it was usually because her foot was too large to be fitted with an "L" sandal. A delivery of sandals designated "400–L" would not be a good delivery where sandals designated "981–M" were ordered, even though it is admitted that both sandals are alike in appearance. When these sandals were ordered, it was assumed and intended that 981–M was a man's sandal, and 400–L was a lady's sandal. One was never substituted or accepted for the other.

Defendant's first witness, a part-time shoe salesman in New York, testified that he was familiar with the sandals at issue. He stated that at his place of employment the sandals were kept in separate boxes marked "Men's" and "Ladies' ", and that on occasion, perhaps one sale

in a hundred, he has sold a man's sandal to a woman. Usually such sales were made when the woman's foot was too large to be fitted with a lady's sandal.

Defendant's other two witnesses were women who had purchased or worn the sandals in question. One testified that she wore a size eleven shoe, and had ordered a pair through the mail in response to a magazine advertisement. However, the sandals did not fit, and she did not wear them. She stated that the evening before the trial, she purchased a pair for her roommate in size seven, and that there was no designation on the sandals whether they were for men or women. The witness, during the trial at the request of defendant's counsel, attempted to wear plaintiff's exhibit 1 (style 981–M, size 7). The demonstration indicated, and the witness stated, that the sandals were too small. Defendant's other witness merely stated that she owned a pair of water buffalo sandals but was neither familiar with its manner of purchase or size.

Subpart A, headnote 2(f) of part 1, schedule 7, of the Tariff Schedules of the United States, expressly limits item 700.35 by excluding all footwear "commonly worn by both sexes." The question presented, therefore, is whether the controverted sandals, identified with the suffix "M", are "commonly worn by both sexes." More specifically, are they commonly worn by women?

The burden of a plaintiff, in a customs classification case, in establishing that an article is "commonly used" in a certain manner is not as onerous as having to establish its chief use. *Holdwire, Ltd.* v. *United States*, 49 Cust. Ct. 19, C.D. 2355 (1962). Common use implies "only a use which is not infrequent and which is common to everyday observation, but which, nevertheless, may not be the chief use of such an article," *United States* v. *McNaughton*, 5 Ct. Cust. Appls. 114, T.D. 34166 (1913). In this instance plaintiff is not seeking to establish that the water buffalo sandals in issue are "commonly worn" by women, but rather than they are *not* "commonly worn" by women. Admittedly, plaintiff has the burden of clearly establishing this fact.

*Webster's Third New International Dictionary* (1966), unabridged, defines "common" to mean:

> "4 a: occurring or appearing frequently esp. in the ordinary course of events: not unusual: known or referred to widely or generally because of frequent occurrence."

Conversely, the antonym of common, uncommon, is said to mean "exceptional, infrequent, odd, peculiar, rare, singular or unusual." *Funk & Wagnalls New Standard Dictionary of the English Language* (1956).

In *A. Zerkowitz & Co., Inc.* v. *United States*, 47 Cust. Ct. 302. Abs. 66043 (1961), the court had to determine whether certain basketball sneakers and tennis shoes were footwear for men, youths, or boys. The collector had determined they were not. Plaintiff argued that the sneakers were made on male lasts and were intended for sale to men, youths, and boys. In sustaining the classification of the collector, and holding that the sneakers were not footwear for men, youths, or boys, the court stated:

> "The evidence offered at the trial seems to suggest that some lasts, particularly those for tennis oxfords, are so made that the shoes made with their use are suitable for and are worn by members of both sexes—in other words, that such a last might not necessarily be specifically identified with either male or female shoes. In this connection, the testimony of plaintiff's own witness, who made the last of the imported shoe, to the effect that shoes made on that last 'can fit boys or girls,' is particularly noteworthy."

On rehearing, in 54 Cust. Ct. 151, C.D. 2525 (1965), the court reiterated its previous ruling and held that, even if plaintiff had successfully established that the sneakers were made on male lasts, it would not of itself be conclusive. In the *Zerkowitz* case, the evidence indicated clearly that the sneakers were used by men and women, and also by boys and girls. Indeed, the court noted that, from the measurements of the imported shoes, it was "possible to conclude that [they were] intended for both men and women * * *." It can not be doubted that the use of the sneakers in that case by both "females and males" warranted their classification as footwear other than for "men, youths, or boys".

An examination of the *Zerkowitz* case would also indicate that, while the cut of the shoe has some bearing on whether it is worn by men or women, a more revealing inquiry is to ascertain who is the ultimate wearer of the shoe. The factual finding of the *Zerkowitz* case, that the sneaker there was worn by both men and women, can not be made of the sandal presently before the court. Unlike the ruling there, the court here finds that the plaintiff has successfully established that the merchandise in question, water buffalo sandals identified with the suffix "M", are footwear for men, youths, or boys. The testimony at the trial established beyond question that the sandals were not only designed and sold for men, but that any use by women was clearly an uncommon one.

Even defendant's witness, a shoe salesman, testified that perhaps one sale in a hundred of those sandals would be made to a woman, and then only where her foot was too large to be accommodated by a sandal with the "L" suffix. Such infrequent usage could hardly be considered common.

Defendant, in its brief, invites the court to examine the sandals in question and asserts:

"Using the contemporary vernacular of the fashion industry, the sandals at bar are 'unisex' items; that is, they are intended to be worn equally by both sexes." (Defendant's brief, p. 6)

Suffice it to say that there is not one word in the record in support of the assertion, and that all of the testimony, with the exceptions noted, is to the contrary.

Defendant has argued further that, taken as a whole, the class of sandals at bar is commonly worn by women as well as men. The court deems it pertinent to state that, in this case, it is not determining the customs classification of all the sandals of a given class, but solely that of the sandals at bar having a style number with a suffix "M". From the record it is clear that, with rare exception, these sandals are not worn by women. The fact that a woman's sandal of the same design is also sold is irrelevant to the issue presently before the court. It does not make the controverted sandals, specifically designed for and worn by men, anything less or other than what they are, "for men, youths, and boys."

In support of its argument defendant has adverted to the change in the tariff schedules effected January 1, 1968, to include item 700.41. This provides as follows:

"For other persons:
Sandals of buffalo leather, the uppers of which consist primarily of straps across the instep and big toe".

This change was made pursuant to the Geneva Protocol to the General Agreement on Tariffs and Trade. While this statute now provides a specific classification for sandals of buffalo leather, for persons other than men, youths, or boys, it is of no assistance to the determination of the present issue, namely, whether the sandals at bar are commonly worn by both sexes. Furthermore, except with respect to the three protests listed in footnote 1 of this opinion, this provision has no applicability or relevance to the merchandise at bar which was imported before its enactment.

From what has been said it is clear that the presumption that attaches to the classification of the customs officials has been overcome. Plaintiff has successfully sustained its dual burden of proving that the classification of the customs officials is erroneous, and that the claimed classification is correct. See *United States* v. *New York Merchandise Co., Inc.*, 58 CCPA 53, C.A.D. 1004 (1970).

In view of the foregoing the claim for the classification of subject merchandise under item 700.35 of the Tariff Schedules of the United States and the assessment of duty at the rate of 10 per centum ad valorem is sustained. Judgment will be entered accordingly.