ABITIBI PRICE SALES CORP., PLAINTIFF *v.* UNITED STATES, ET AL., DEFENDANT

Court No. 85-06-00793

(Decided October 6, 1989)

*Stuart E. Schiffer,* Acting Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office *(James A. Curley),* Civil Division, United States Department of Justice and *Karen P. Binder,* United States Customs Service, for defendant.

*Taft, Stettinius & Hollister (G David Schiering)* for plaintiff.

## OPINION

RESTANI, *Judge:* Plaintiff, Abitibi-Price Sales Corporation (Abitibi), brings suit pursuant to 28 U.S.C. § 1581(a) (1982) and 19 U.S.C. 1515 (1982) protesting the United States Customs Service (Customs) classification of certain entries of paper from Canada as "writing paper" under item 252.75 of the Tariff Schedules of the United States (TSUS) (1983). Plaintiff claims that the correct paper classification is uncoated "book paper and printing paper, not specially provided for," as set forth at TSUS item 252.67.[1] In addition, plaintiff claims that some of its shipments should have been classified as "standard newsprint," under TSUS item 252.65. Defendant for its part argues that it correctly classified the subject merchandise as "writing paper" under TSUS item 252.75. Alternatively, if the paper is found to be neither writing nor printing paper, defendant claims that classi-

---

[1]TSUS Schedule 2, Part 4 (1983) provides in relevant part:

Papers, not impregnated, not coated, not surface-colored, not embossed, not ruled, not lined, not printed, and not decorated:

\*      \*      \*      \*      \*      \*      \*

| | Printing papers: | |
|---|---|---|
| 252.65 | Standard newsprint paper | free |
| 252.67 | Book paper and printing paper, not specially provided for | free |
| 252.75 | Writing paper weighing over 18 pounds per ream | 4.2% ad val. depending on item's date of entry. |
| 252.90 | Other, not specially provided for: Weighing over 18 pounds per ream | |
| | Other | 9.3% ad val. |

fication under the basket provision for plain paper of the applicable weight under TSUS item 252.90 is appropriate.

## A. Facts

This case involves the importation of paper products from Canada. The subject paper as sold is marked "Abiform," followed by a numerical designation referring to the brightness of the stock (i.e., Abiform 65, Abiform 70). Abiform is composed of approximately 75% to 80% "groundwood" or "mechanical" fiber, with the remaining composition consisting of chemical pulp. It is principally used to make computer printout paper for high speed data processing systems which utilize impact printers. The paper is sold to form converters which slit, punch, perforate, fan fold the paper, and additionally, sometimes print bars and numbers on the sheets.

During the 1970's paper products entered as "printing paper" under TSUS item 252.67 were dutiable. *See e.g.* TSUS item 252.67 (1978). Beginning in 1980, however, such products became duty free. *See* TSUS item 252.67 (1980). Plaintiff claims that as early as 1978, and until 1983, it imported Abiform into the United States under TSUS item 252.67. Plaintiff's Post-trial Brief at 47. Plaintiff introduced both testamentary and documentary evidence to demonstrate that from 1980 until 1983 Abiform was generally imported into the United States duty free under either TSUS item 252.65 or item 252.67. *See e.g.* TR at 42, 602–03, 145, 147 & Plaintiff's Exhibit 67. Customs, on the other hand, produced no evidence on this issue.

The evidence reveals that in 1983 Customs began to classify Abiform as "writing paper" under TSUS item 252.75. If Abiform was ever classified as writing paper before that time it was not apparent from the evidence. Classified as writing paper, the goods are dutiable. Plaintiff filed timely protests for those entries classified as writing paper. Those protests were denied by Customs and later forwarded to Customs Headquarters for further review. On November 26, 1984, Customs issued a Headquarters Ruling Letter confirming its view that the subject merchandise was writing paper. *See* Headquarters Ruling Letter (HRL) 074564. On December 12, 1985, Customs issued a second Ruling Letter regarding a separate set of entries and a separate protest, stating that Abiform entries meeting the standard newsprint physical specifications of Treasury Decision (TD) 68–265(20), 2 Cust. Bull. 597, 598 (1968) should be reliquidated as standard newsprint under item 252.65 and that the balance of the paper was correctly classified as writing paper under item 252.75. Plaintiff's Exhibit 8 (HRL 076053).[2] Plaintiff therefore filed suit in this court challenging Customs' denial of its protests.

---

[2] It is not clear exactly how often between 1978 and 1985 Abiform meeting physical requirements of standard newsprint was classified under item 252.65.

## B. PARTIES' ARGUMENTS

Plaintiff asserts that a uniform and established practice existed which bound Customs to continue accepting classification of Abiform under TSUS item 252.67 until such time as Customs effectively notified the parties of a change in practice. In addition, plaintiff seeks to require Customs to abide by its Ruling Letter of December 12, 1985, and thus classify under TSUS item 252.65 any of plaintiff's goods which meet the descriptive specifications of "standard newsprint paper" set forth in T.D. 68–265(20). Plaintiff also claims that defendant's writing paper classification is based on an erroneous assumption that the paper is not properly classifiable as printing paper. It claims that printing paper is a general or common use provision.[3]

Defendant's classification is based on two sets of criteria. First, the government determined that a physical analysis of Abiform demonstrated that it has the characteristics of writing paper. Second, the government reasoned that Abiform could not qualify as printing paper under TSUS item 252.67 because that provision is a "chief use" provision[4] and the subject merchandise is not used principally for printing.[5] Therefore, the government reasoned, Abiform must necessarily be writing paper.

## C. DISCUSSION

### 1. *Framework for Analysis and Background:*

In determining whether the subject merchandise was correctly classified as "writing paper" under TSUS item 252.75, the court must determine *de novo* "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Kalan Inc.* v. *United States,* Slip op. 88–165 at 2 (December 1, 1988) (*quoting Jarvis Clark Co.* v. *United States,* 733 F.2d 873, 878 (1984), *reh'q denied,* 739 F.2d 628 (Fed. Cir. 1984)). Defendant's classification of the subject goods as writing paper is presumptively correct. Plaintiff, therefore, bears the burden of overcoming this presumption of validity. *Id.* at 2–3.

Some historical background is needed for a full understanding of this matter. What appears to have happened in this area is that technology has blurred the lines between what in the trade were once known as, and under the TSUS are still classified as, distinct categories of merchandise. That is, except for certain papers with very specific uses, communications papers have generally fallen in-

---

[3]Common use implies a use which is not infrequent and which is "common to everyday observation, but is not necessarily the chief use of the article." 2 R. Sturm, *Customs Law & Administration,* § 53.3 at 18. *See also, Amity Fabrics, Inc.* v. *United States* 51 Cust. Ct. 97, C.D. 2416 (1963), *appeal dismissed,* 51 CCPA 129 (1964); *De Vahni International, Inc.* v. *United States,* 66 Cust. Ct. 239, 243, C.D. 4196 (1971), *appeal dismissed,* 259 CCPA 223 (1971).

[4]"Chief use means the principal or predominant use, neither exclusive use nor a fugitive or experimental use, but the usual and common use." 2 Sturm, *supra,* § 53.3 at 11 (1988).

[5]"Printing" is not a term the meaning of which has been agreed to by the parties for purposes of this case. The court's conclusion as to its meaning is discussed *infra,* principally, in sections C2d and e.

to three basic categories: (1) standard newsprint, (2) book and printing paper, and (3) writing paper. Although at the time of enactment of the Tariff Act of 1930 there was apparently some confusion over the boundary between standard newsprint and book and printing paper,[6] there appears to have been no such confusion as to the dividing line between printing paper and writing paper.

The Tariff Schedules of 1960 reflected the same basic division, although some of the former items were divided and placed under new headings. For example, the United States Tariff Commission, *Tariff Classification Study*, Schedule 2—Wood and Paper; Printed Matter at 102,[7] states that writing paper under item 252.75, along with two other items, covers those products formally classified under paragraph 1407(a) of the Tariff Act of 1930.[8] Book and printing paper under item 252.67 is described in the *Tariff Classification Study* as "a general use category which includes paper in various grades for printed matter, envelopes, tablets, coating base stock, etc." *Id.*

The continuing problem of how to classify newsprint is also reflected in the *Tariff Classification Study* at 99–101. The dividing line between printing and writing paper, however, does not appear to have presented a problem in 1960, any more than it did in 1930. There seemed to be basic agreement as to what was a writing paper and what was a printing paper. In fact, the court could find no cases reflecting any dispute as to the meaning of these items in relation to each other. At this time, however, there seems to be confusion as to what constitutes writing, what constitutes printing and where the line is to be drawn between the categories of "printing paper" and "writing paper," both in terms of use and physical characteristics.

---

[6]*See generally Crown Willamette Paper Co.* v. *United States,* 16 Ct. Cust. App. 431 (1929) (interpreting Tariff Act of 1922, Schedules 13 & 15, Pub. L. No. 318, 42 Stat. 858 at 908, 931 (1922)) and Tariff Act of 1930, Schedules 14 & 16, Pub. L. No. 361, 46 Stat. 590 at 653, 681 (1930).

[7]The *Tariff Classification Study* is part of the legislative history of the TSUS. *Omark Industries* v. *United States,* 12 CIT 791, 703 F. Supp. 85, 91–92 (1988) *aff'd,* Appeal No. 88–1144 (C.A.F.C. June 26, 1989); *Brechteen Company* v. *United States,* 854 F.2d 1301, 1306–07 (Fed. Cir., 1988); *Rifkin Textiles Corp.* v. *United States,* 55 Cust. Ct. 341, 350, C.D. 2600 (1965), *aff'd,* 54 CCPA 138, 441, *cert. denied* 389 U.S. 931 (1967).

[8]Paragraph 1407(a) of the 1958 United States Import Duties Schedules to the Tariff Act of 1930 states in relevant part:

All the following, if weighing 8 pounds or more per ream of 187,000 square inches:

    Bond paper, Japan and imitation Japan paper by whatever name known, ledger, manifold, onionskin and imitation onionskin, record, tablet, and typewriter papers, and papers similar to any paper provided for in this subparagraph; all the foregoing:

        Not bordered, decorated in any manner, embossed, lined, printed, or ruled

        Bordered, embossed, lined, printed, ruled, or decorated in any manner, in the pulp or otherwise, other than by lithographic process

\*      \*      \*      \*      \*      \*      \*

Correspondence cards and letter, note, and writing paper:

    Not bordered, decorated in any manner, embossed, lined, printed, or ruled:

        In rolls, or in sheets of 110 square inches or more

        In sheets of under 110 square inches

    Bordered, embossed, lined, printed, ruled, or decorated in any manner, in the pulp or otherwise, other than by lithographic process:

        In rolls, or in sheets of 110 square inches or more

        In sheets of under 110 square inches

\*      \*      \*      \*      \*      \*      \*

With this background in mind, the court finds it less than helpful to attempt at the outset to mechanically categorize the TSUS items at issue as chief use or common use or even as *eo nomine* provisions.[9] First, the court is not certain that such categorization answers any of the questions at issue. Second, the court is mindful that in determining legislative intent one must keep in sight the entire legislative context, including past practice and precedent.[10]

Accordingly, the court will set aside, at least for the moment, the question of how these provisions should be labelled. Although a general "basket" provision covering neither writing nor printing paper is alternatively claimed by defendant, it is unlikely to prove a useful alternative.[11] In any case, it seems appropriate to address first the central issues at trial, that is, whether Abiform may be classified as either writing or printing paper under ordinary principles of classification analysis.

## 2. *Writing v. Printing Paper:*

In determining whether Abiform is "writing paper" or "printing paper" the court will look at several factors. These factors include: (1) the general physical characteristics of Abiform, (2) the expectations of the ultimate consumers, (3) the channels, class or kind of trade in which Abiform moves, (4) the economic practicality of using the merchandise for either writing or printing, (5) trade recognition of its writing or printing use, *see generally, United States* v. *Carborundum Co.,* 63 CCPA 98, 102, C.A.D. 1172, 536 F.2d 373, *cert. denied,* 429 U.S. 979 (1976) (the court looked at these five factors, among others, to determine if the subject goods were within a class or kind of goods generally known as ferrosilicon.),[12] and (6) the structure of the TSUS and its legislative history, as well as past administrative practice.

---

[9]*Nippon Yusa Kaishi* v. *United States,* 4 Cust. Ct. 218, 220, C.D. 325 (1940) adds to the confusion of proper labeling of these provisions by indicating that "writing paper, printed" under Para. 1402(a) of the Tariff Act of 1930 is an *eo nomine* provision.

[10]Of note is TSUS General headnote 10(e)(i) which provides in relevant part:

10. *General Interpretative Rules.* For the purposes of this schedule—

\*          \*          \*          \*          \*          \*          \*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined.

Two questions arise in the context of this case: (1) Are the TSUS items at issue controlled by use? (2) If so, does the context indicate that other than chief use analysis should be employed?

[11]Defendant claimed this alternative classification only after the possibility was mentioned by the court at trial. One objective of the Tariff Classification Act of 1962, Pub. L. No. 87–456, 76 Stat. 72, 19 U.S.C. § 1202, however, was to deemphasize the importance of and to restrict the scope of "basket" provisions. 2 Sturm, *supra* § 50.2 at 7 (1988) (*citing Hawaiian Motor Co.* v. *United States,* 67 CCPA 42, C.A.D. 1241, 617 F.2d 286 (1980); *S.G.B. Steel Scaffolding & Shoring Co., Inc.* v. *United States,* 82 Cust. Ct. 197, C.D. 4802 (1979)).

[12]Although the court used these factors to determine if the merchandise was in a class "commonly used" as raw material in the manufacture of ferrous metals, there seems to be no reason not to consider them in determining whether Abiform is "printing paper" or "writing paper" irrespective of how one labels the applicable provisions. Neither party appears to object to this approach.

### a. *The Physical Composition of Plaintiff's Paper:*

Addressing first the physical composition of Abiform, the court finds that there was overwhelming testimony at trial that Abiform is made out of and is essentially of the same grade as the type of paper which is chiefly used for printing in the United States. According to the unrebutted trial testimony of one of plaintiff's witnesses there are basically two distinct processes for producing pulp from which most communications paper is made. One process produces groundwood or mechanical pulp and the other process produces chemical pulp. TR at 439–46. Groundwood pulp is produced by using almost the entire tree, including the non-cellulosic impurities, one of which is lignin, a natural bonding material. TR at 443–44. The pulp is then bleached to brighten it; although, according to plaintiff's witness, there are limits on the extent to which such pulp can be brightened. TR at 442–45. Chemical pulp, on the other hand, is produced by dissolving away the non-cellulosic impurities, including the lignin, in which case only about 50% of the tree is used. TR 443–44. Chemical pulp then goes through a different method of processing, with the end product resulting in a type of paper which is brighter, has stronger surface strength, and is less permeable to liquid than paper made of substantial amounts of groundwood. TR at 450–55, 457–60. Generally, the paper produced from chemical pulp is commonly known as freesheet or bond paper. TR at 450, 836, Ex. 82. Such paper may be writing paper.[13] There is no dispute that Abiform is composed of approximately 80% groundwood, and there was no significant evidence produced that the industry considers any particular converting paper of such composition to be a "writing paper." *See* TR at 464–66.[14] Nonetheless, if a "writing paper" could be made of 80% mechanical pulp, it would still have to be suitable for writing purposes.

### b. *Functionality and Purchaser Expectations:*

In regard to the expectations of the purchaser, plaintiff offered virtually unrebutted testimony at trial which established that Abiform does not have the characteristics normally expected of writing paper by the paper industry. Terrence Fox, Ph.D., one of plaintiff's witnesses was qualified as an expert on paper engineering. Among other related qualifications which enhanced his credibility, Dr. Fox had been involved directly with this area since 1976. Dr. Fox testified that he had performed a series of tests upon the

---

[13]Writing paper was described at the time of enactment of the TSUS as "paper made of bleached wood pulps, alpha pulp and rag stocks," and having "brightners" and "good sizing to writing ink." J. B. Calkin & G. S. Witham, Sr. *Modern Pulp and Paper Making* 37 (3d ed. 1960). This source also states that the cheaper grades of tablet paper "may contain some groundwood." *Id.* The implication is that writing papers normally do not contain a great deal of groundwood. Headnote 2(d), part 4 of Schedule 2 of the TSUS describes writing paper as including ledger, letter manifold, mimeograph, note, onionskin, tablet, and typewriter papers. *The Dictionary of Paper* 457 (4th ed. 1980) does not appear to disagree in any fundamental way with these sources.

[14]Some of defendant's witnesses compared the paper at issue to freesheet forms paper. They appear to recognize a new class of paper for computer use and they lump both freesheet forms paper and groundwood forms papers into it. As shown, the tariff schedules do not take this approach. A representative of the domestic industry testified that forms paper is not marketed as writing paper. TR at 856. In fact, the witness' employer markets its business forms converting paper as "groundwood printing paper." TR at 849, Ex. 68 at 11. *See also* TR at 277.

subject paper to establish its feasibility for use as writing paper. TR 520–21. The evidence established that the tests were conducted in conformance with the applicable scientific procedures prescribed by the Technical Association of the Pulp and Paper Industry (TAPPI). Dr. Fox testified that 6,000 individual tests were performed on plaintiff's merchandise to determine its quality under the following criteria: feathering, erasure, brightness, surface strength, surface smoothness, permeability, sizing, wettability, and furnish. TR at 526–30. In each of these areas, Dr. Fox found that plaintiff's merchandise was not of the quality usually expected of writing paper by the industry. TR at 538–54. He concluded that Abiform was not designed to be written on and was "unsuitable as a writing paper." TR at 550. In light of his qualifications and the detail of his testimony and supporting documents, the court found Dr. Fox to be a highly credible witness.

On the other hand, the court found the "scientific" procedures testified to by defendant's witness on Abiform's characteristics as writing paper to have been less than scientific. See TR at 886–904. Furthermore, because of his background, his responsibilities, and his lack of knowledge of certain test procedures defendant's witness was less persuasive than Dr. Fox. First, the tests were not performed by the witness but by other analysts. TR at 903. The witness supervised the analysts, but his relation to the reports about which he testified was not explained. TR at 889. Second, the witness is a Customs chemist and did not claim to be a paper expert. TR at 869 & 884. Third, even if government-approved testing procedures were used, as defendant argues, the object of the tester's analysis was not exactly clear. Whether or not some set of government standards for writing paper should have been the focus, the court is unconvinced by defendant's witness' testimony that any significant indicia of writing paper status were met. What criterion was applied to draw the line between printing and writing paper was not explained. Although the witness testified that Customs reports showed that Abiform displayed acceptable writing characteristics, there seemed to be an absence of any objective criteria upon which this conclusion was based. TR at 873, 878. Finally, one Customs' Laboratory report indicates that the paper was sized,[15] which is clearly not the case. See TR at 453, 460, 857, 928 and Ex. 26 at 27. The witness' testimony that Abiform was writing paper and not printing paper based on some unclear set of standards was greatly outweighed by other evidence submitted throughout the proceedings indicating that industry standards for writing paper were not met.[16]

---

[15]Sizing gives writing paper the ability to keep watery ink from sinking into the paper and spreading. See The Dictionary of Paper 402 (3d ed. 1965); accord The Dictionary of Paper 377–78 (4th ed. 1980). See also, supra, n.13.

[16]Neither party focused on whether the goods would be acceptable to purchasers as traditional printing paper, but it is clear that any paper with Abiform's characteristics can be sold readily as commercial printing paper. See infra note 17. Price makes it impractical to sell Abiform as printing paper for the media trade, catalogues or, hand bills. On the other hand, Abiform is less expensive than freesheet forms paper, to which defendant likens it.

c. *"Class or Kind" Analysis:*

When analyzing the general physical characteristics of a particular article for purposes of tariff classification, courts have often looked to whether the goods fit into a particular class or kind of merchandise. This type of analysis is most helpful when the particular class or kind can be related to the specific tariff classifications at issue. In this case, both plaintiff and defendant have argued that Abiform is in a particular class of product. They then attempt to forge a link between that class and a certain TSUS item. For instance, plaintiff claims that its subject merchandise is part of a class or kind of paper known as "uncoated groundwood paper" or "uncoated groundwood printing paper" and that such paper is chiefly used for printing. The latter clause is undisputable; uncoated groundwood paper is chiefly used for printing. The testimony is clear that Abiform is an uncoated groundwood paper; whether or not it is a "printing paper," however, is a relevant and disputed point.

Defendant argues that "[u]ncoated groundwood paper, and uncoated groundwood printing paper, are too broad a grouping to form a class or kind." Defendant's Post-Trial Brief at 29. Instead, defendant argues that plaintiff's merchandise is recognized in the trade as a "groundwood form bond paper, or a groundwood forms paper, that is specially treated during manufacture to allow it to be converted to computer printout paper," *id.* at 31, and that such paper is writing paper. No credible evidence has been cited demonstrating that "groundwood forms paper" is a class of paper that can be related in a meaningful way to the tariff schedules. "Groundwood Forms Bond" is listed in U.S. Government Paper Specifications Standards, *see* Defendant's Ex. KK, but those standards do not match the TSUS system of classification. Furthermore, the specifications contained therein for "Groundwood Forms Bond" emphasize printing functionality, although they do not say whether "Forms Bond" is a printing paper or a writing paper.

d. *Channels of Trade, Trade Recognition and Feasibility of Use:*

Defendant argues that plaintiff's goods are not typically sold or used in the same channels of trade as is printing paper. In this regard defendant claims that "the customers for form bond and groundwood form bond are forms converters while the customers for offset and rotogravure printing papers are commercial printers, publishers, and merchants who in turn sell to printers and publishers" and that "[f]orms converters are an industry separate from commercial printing and publishing." Defendant's Post-Trial Brief at 22 (citations omitted). Defendant arrives at these conclusions by comparing plaintiff's customer list for Abiform with plaintiff's customer list for other types of printing paper. *See id.* Defendant fur-

---

Overall, price comparisons add little to resolution of this matter. Specific findings regarding industry acceptance of "Abiform" as a specific type of printing paper are discussed further *infra* in section C2d.

ther asserts, premised on its definition of printing, that, although the subject merchandise may consist of the same compositional qualities as recognized groundwood printing papers (*e.g.*, Abitibi's own offset paper), due to Abiform's unique characteristics (*i.e.*, it is sold on the basis of different ream sizes, at different prices and arguably has additional properties that make it particularly suitable for forms conversion)[17] plaintiff's product cannot feasibly be used as printing paper.

The court finds these arguments to be largely inapposite because they grow out of a narrow definition of printing, which excludes all forms conversion and use. "Printing paper" has a broader meaning than defendant appears to recognize. *See Tariff Classification Study* at 102. *See also, infra* section C2e and *supra* note 14. If defendant is arguing that Abiform must be chiefly used in the book, periodical, or catalogue printing industry or in some other narrow class of printing, it has offered no evidence to support this view. As far as the court can tell from the structure of the TSUS, prior precedent, and past administrative practice, the category "printing paper, not specially provided for" is intended to be a broad one. There is nothing in the statute or cases reviewed by the court which limits the word "printing," in the TSUS item at issue, to any particular kind of printing.

Abiform is manufactured specifically to run on offset printing presses used by form converters. TR 363–67.[18] That is, Abiform must be suitable for running in traditional printing operations, such as offset, because form converters print bars and numbers on some computer printout papers made from Abiform. TR at 173–74. Such paper, after conversion, becomes a *printed* form.

Although defendant concedes that this printing is performed on Abiform, it argues that this printing function "does not add information, and is incidental or perhaps unnecessary," and that "[m]any types of paper are printed on, such as, tablet, letter head stationery, napkins, toilet tissue and toweling, which are not printing papers." Defendant's Post-trial brief at 32. It has not been established that *printing* must impart information. As indicated, the court reads the term "printing" broadly. Furthermore, "information" may be defined more broadly than the definition defendant perceives. Moreover, how the type of "printing" defendant refers to in its brief, (on napkins, *etc.*) *see id.,* is accomplished, was never well explained at trial. Thus, the court cannot compare the processes. Finally, defendant confuses the central issue. It is not the fact that paper is actually printed upon which determines whether this pa-

---

[17]Physically, paper comprising Abiform may be identical to that comprising certain Abitibi standard printing products. TR at 266–67. Apparently Abiform must be manufactured under certain environmental conditions and controls, while certain Abitibi offset papers may be manufactured under a wider variety of conditions. Thus, sometimes Abitibi's offset paper and the Abiform paper are identical in physical form as well as functionality, while at other times they vary somewhat. TR at 496–500. In other words all Abiform paper can be sold as offset paper, but all of the offset production may not be sold as "Abiform."

[18]The offset printing press process applied to Abiform was described at trial. *See* TR at 173–74.

per is classifiable as "printing paper," but rather that the paper is of the type predominantly used for printing and that among other things this particular product is manufactured and sold for its printability. TR at 172, 276, 364–65, 371, 373. Thus, its printability is not incidental in terms of its marketing or functionality.

While one may also print on some writing papers, such papers are distinguished by physical characteristics that allow them to be sold and used for traditional writing purposes. Abiform, whether or not it can be written upon in some manner, is not a commercially acceptable writing paper. In fact, defendant's own Paper Specifications Standards, *See* Defendant's Ex. KK, support the view espoused by plaintiff that Abiform is not a writing paper. Except for what is labelled "Groundwood Forms Bond"[19] any paper with "writing" or "bond" in its name is described as having chiefly chemical pulp or rag content. This is consistent with both plaintiff's and defendant's testimonial evidence. *See e.g.,* TR at 549, 836.[20] *See also supra* sections C2a and b.

Even from a strictly end use point of view Abiform cannot be considered a writing paper. Abiform, after conversion, is not used in modern office word processing and is not sold for use with pen and ink for other or traditional writing methods. TR at 174, 177. The kind of paper ultimately produced from Abiform is used in data processing operations, is wider than typewriter paper, TR at 175–76, and yellows over time in much the same way as does newsprint, *see* TR at 452, 732, which it visually resembles.[21] The paper produced from Abiform is not used as is typewriting paper and is not of that quality. To call Abiform a writing paper because the end use product made from it is used with a type of impact printer is to stretch the term "writing paper" beyond its historical tariff and current industry meanings as will be explained further in the following section.

e. *Legislative History and Administrative Practice:*

As the plain words of the Tariff Schedule give the court little guidance as to the correct classification of the paper at issue, the court may resort to an analysis of common usage, dictionary definitions, or the *Summaries of Trade and Tariff Information* (Summaries). *Bar Zel Expediters, Inc.* v. *United States,* 3 CIT 84, 93, 544 F. Supp. 868, 875 (1982). Although the *Summaries* are not evidence of legislative intent, *Volkswagen of American, Inc.* v. *United States,* 68 C.C.R. 122, C.D. 4348, 340 F. Supp. 983, 988 (1972), they may be employed by the court as a vehicle for ascertaining administrative practice or

---

[19]Based on the testimony in this case this term must be viewed as somewhat internally inconsistent.

[20]That Abiform is sold in rolls from the mill and is not sold by the manufacturer in sheeted form, as is much writing paper, provides additional support for the conclusion that Abiform is not writing paper but printing paper. TR at 357–58. Whether writing paper ream sizes are used in marketing seems less significant than the actual physical form of the product.

[21]Although Abiform is whiter than standard newsprint, it is not as white as ordinary typewriter paper. In fact defendant admits in its Post-Trial brief at 12 that even "freesheet form bond" or "register bond" is brighter, stronger and lasts longer than "groundwood form bond."

particular meanings of tariff terms. *United States* v. *Standard Surplus Sales, Inc.,* 69 C.C.P.A. 34, 667 F.2d 1011, 1014 n.4 (1981). When such practice is established at the time of enactment of a statute or provision, the court will presume that Congress has incorporated such administrative practice, unless Congress specifically designates otherwise. In this context even advisory evidence will assist the court in ascertaining the common meaning attributed to a tariff term. *See Bar Zel, supra* at 875.

Both the 1968 and 1984 Summaries which discuss item 252.67, state that:

> [u]ncoated groundwood printing and converting papers are used principally for magazines, comic books, catalogs, directories, and general commercial printing. Substantial quantities are used also as base stock for coated papers and for conversion into a wide variety of paper products, such as salesbooks, envelopes, business machine rolls, teletype rolls, mimeograph and typewriter paper, *office forms,* tablets, and waybills. Also included here are those types of newsprint not meeting U.S. Customs Service specifications for standard newsprint paper. (emphasis added).

Summary of Trade and Tariff Information, USITC Pub. 841, No. 2-4-25 at 23 (1984); Summaries of Trade and Tariff Information, Vol. 3, Schedule 2, T.C. Pub. 247 at 159 (1968). The Summaries do not reveal a different approach than that which existed when the TSUS was enacted. *See Tariff Classification Study* at 102. As the Summaries make clear, TSUS item 252.67 covers a type of paper which is typically used for a wide range of functions, which includes paper used to make some types of office forms. Thus, as a matter of practice Customs considered "uncoated groundwood printing and *converting* papers" to be within the broad category of "uncoated book and printing papers."

In this case, although it seems clear from HRL 076053 that Customs views Abiform as a type of newsprint, Customs classified Abiform (except for some entries of Abiform meeting standard newsprint specifications) as writing paper because Abiform is converted into computer output paper allegedly used for "recordation of data by pen, pencil, typewriter, or similar device." HR 076053 at 3. Customs' view now seems to be that all business forms paper is writing paper no matter what physical characteristics it manifests or what its particular "forms" end function may be.

Although Customs did not address whether Abiform was also a printing paper, defendant argued in court that it was not. As indicated, defendant argued to the court that the TSUS "printing paper" provision is a chief use provision.[22] It then argued that Abiform was not used for "printing" in the narrow sense of that

---

[22]Chief use provisions traditionally have been among the more narrow or specific types of classification provisions.

word. The court finds defendant's rationalization for classifying the subject goods as writing paper, but not printing paper, for the most part to be at odds with past administrative practice. It seems that Customs has consistently looked at the physical quality and functionality of imported paper to determine its appropriate classification under the TSUS and has also treated the category of printing paper as a broad one, as has the court. *See e.g. Clements Paper Co.* v. *United States,* 29 Cust. Ct. 218, C.D. 1471 (1952) (railroad waybill forms paper).

It is apparent that Congress in 1960 did not contemplate how to classify papers manufactured specifically for data processing, nor did it provide a clear indication as to whether the output of rapid data processing was "printing" or "writing" as items 252.67 and 252.75 employ those terms. It can be said, however, that Congress envisioned that paper classifiable as printing paper would be of a type manufactured for and used in a variety of print functions, including some forms conversion. Testimony at trial established that the quality, grade, or type of paper typically utilized by the printing trade as printing paper is a groundwood paper made from mechanical pulp like Abiform. Form converters, like commercial printers, use groundwood paper such as Abiform for some purposes.[23] Furthermore, Abiform is made to run on presses utilizing standard printing techniques such as offset.

The fact that the paper, after conversion, is intended to be used with certain computer impact printers does not alter the classification of the paper as imported. Impact printers are not standard commercial printing presses, *see Data Products Corp.* v. *United States,* 4 CIT 234, 237, 558 F. Supp. 124 (1982); but neither are all impact printers used with typewriter-like equipment. In this vein, every paper manufactured to be used ultimately with impact printers is not necessarily a writing paper. That is, the court sees nothing to indicate that every use of an impact printer is a "writing" function within the meaning of item TSUS 252.75. In fact, the particular function described here seems far removed from common and industry definitions of "writing." *See* TR 174, 176–77.

The court perceives that whether or not the "printing paper" TSUS item is a "chief use" provision, it is of broader scope than the TSUS's "writing paper" provision. Its "not specifically provided for" wording supports that interpretation. Abiform is a paper of printing quality which is manufactured for its printing characteristics and which is converted into data processing output paper by standard printing techniques. Until the law is changed to reflect technological development so that the ultimate end use as discussed here is more compatible with tariff categorization, the historical tariff treatment of paper should not be ignored and the immediate use, physical characteristics and industry recognition of the product

---

[23]Form converters may also use writing quality papers. Such papers were not before the court.

should control. Accordingly, the court concludes that until Congress makes a new category which covers non-writing quality "forms" papers which are used after conversion in other than traditional writing or modern word processing operations, such papers must be classified in the broad category of book and printing paper under item 252.67, and they cannot be classified as writing papers.

3. *Standard Newsprint:*

It is unclear whether the court need reach the issue of whether some of the subject merchandise is standard newsprint. In any case, for the sake of completeness the court will address it. The parties are in basic agreement that not all of plaintiff's subject goods qualify for classification as standard newsprint. Plaintiff nonetheless asserts that at least some of its merchandise should be classified as such in accordance with T.D. 68–265(20), 2 Cust. Bull. 594, 598 (1968). Defendant for its part claims that none of plaintiff's merchandise qualifies for standard newsprint classification under TSUS item 252.65. It appears undisputable that standard newsprint is a "chief use provision." *See* T.D. 56349, 100 Treas. Dec. 33 (1965). It seems fairly well established that if a paper product is not manufactured and sold predominantly as paper to be used for printing newspapers, it is not standard newsprint. Even pre-TSUS cases make clear that in order to be classifiable as standard newsprint, the imported paper must be used for printing ordinary newspapers. *See Geo. S. Bush & Co., Inc.* v. *United States,* 37 Cust. Ct. 45, 54, C.D. 1797 (1956); *Crown Willamette Paper Co.* v. *United States,* 16 Ct. Cust. App. 431, T.D. 43187 (*aff'g* Abs. 1864) (1929); *Prensa Insular de Puerto Rico, Inc.* v. *United States,* 4 Cust. Ct. 60, C.D. 285 (1940). Although plaintiff's product may in some instances be of the same composition as standard newsprint, it is different from standard newsprint in several ways because of the manner in which it is manufactured. Furthermore, the testimony at trial established that plaintiff does not sell Abiform as newsprint and does not sell it to newspaper companies, chiefly because Abiform has no practical use as standard newsprint. *See* TR at 827. Consequently, under any theory, Abiform cannot be classified as "standard newsprint."

CONCLUSION

Plaintiff has met its burden of proving that imported merchandise is not properly classifiable as "writing paper" under TSUS item 252.75. Furthermore, plaintiff has established that Abiform is classifiable under TSUS item 252.67 as unimpregnated, uncoated, etc., book or printing paper. While the court has some doubts about the adequacy of the proof of a uniform and established practice of classifying the subject merchandise under TSUS item 252.67, the court need not finally resolve this issue because the court, nevertheless, finds that the subject merchandise is properly classifiable under TSUS item 252.67.