**No. 57662.**—Freedman & Slater, Inc. *v.* United States, protest 141349–K (New York).

RAO, Judge: An importation of sulphite paper, in sheets 22 by 34 inches, was classified by the collector of customs at the port of New York as bond paper, and assessed with duty at the rate of 3 cents per pound and 15 per centum ad valorem pursuant to the provisions of paragraph 1407 (a) of the Tariff Act of 1930. A protest was duly filed against said classification and assessment, in which it was alleged that the merchandise in question is standard uncoated printing paper, dutiable at the rate of ⅙ cent per pound and 5 per centum ad valorem, as provided for in paragraph 1401 of said act, as modified by the trade agreement with Canada, 74 Treas. Dec. 235, T. D. 49752.

The pertinent provisions, insofar as here applicable, read as follows:

PAR. 1407. (a) Correspondence cards, writing, letter, note, drawing, and handmade paper, paper commonly or commercially known as handmade or machine handmade paper, japan paper and imitation japan paper by whatever name known, Bristol board of the kinds made on a Fourdrinier or a multicylinder machine, ledger, bond, record, tablet, typewriter, manifold, onionskin, and imitation onionskin paper, and paper similar to any of the foregoing, all the above weighing eight pounds or over per ream, 3 cents per pound and 15 per centum ad valorem; * * *

Paragraph 1401, as modified by the trade agreement with Canada, *supra*:

Uncoated papers commonly or commercially known as book paper, and all uncoated printing paper, not specially provided for, not including cover paper, ⅙¢ per lb. and 5% ad val.

At the trial, one witness was called to testify on behalf of the plaintiff, and two witnesses testified for the defendant. Their testimony is sharply in conflict, plaintiff's witness being of opinion that the involved paper is uncoated printing paper and not bond paper; defendant's witnesses being of a contrary opinion The issue, therefore, is primarily one of fact dependent solely upon the weight of the evidence.

For the plaintiff, William A. Sullivan, a buyer of paper for John B. Harris Co., the ultimate consignee herein, testified that his company is known in the trade as a coarse-paper merchant, that is, one which handles heavier papers, like wrapping paper or boards, as distinct from fine papers, such as bond and ledger papers. The witness had been employed by John B. Harris Co. for 30 years, and had been in the paper business for 38 years. In the course of those years he had bought paper both in the United States and in Europe, and had seen it

manufactured in both areas. He personally purchased the paper at bar, a sample of which is in evidence as plaintiff's exhibit 1, and saw to its manufacture in Finland, the country of exportation. Sullivan called the merchandise a machine-finished, uncoated printing paper, which was produced in the following described manner:

A. Well, in the first place, it was always bleached sulphite pulp that is placed in a beater. There are various classifications of pulp—there's better grades and cheaper grades and so forth.

Q. What kind of grade was this?—A. Fairly cheap. It is put into that beater and churned around in a revolving fashion with the blades grinding it up, and this type of paper would be what we call beat one or two hours and then it would be dropped down into a chest. The chest would further macerate this stock or pulp, then it would be pumped up into what they call a sluice box. It would flow out on what is known as a wire. Now, that wire shakes in this fashion.

Q. It shakes latitudinally and longitudinally?—A. Both—one known as a Fourdrinier. Now, she comes off the Fourdrinier wire and is carried on to a felt. The felt presses the wet stock up against the cylinders which are heated, either by steam or electricity, and runs along in the festooning fashion in some instances, as this particular paper machine had a double-decked cylinder, heat cylinders which were in all about 90. By the time it reaches the ends of those driers, it has been sufficiently dried to rewind on the rewind shaft and from there on, they sheet it or slit it or whatever they would do with it.

In the opinion of this witness, the factors which determine the type of paper produced by the machine which he described are as follows: The grade of pulp; the running time of the paper machine; the length of time the pulp is macerated; the width of the machine; and the width of the mesh in the Fourdrinier wire.

In connection with these factors, the witness explained that a second grade of pulp was used to produce the instant merchandise; that a finer grade of paper would be run more slowly than the 800 to 900 feet a minute, the rate at which plaintiff's exhibit 1 was run; that a fine grade of paper would have to be beaten at least 3 or 4 hours, or twice as long as was required in this instance; that the machine which made this paper was 100 inches wide, whereas better grade papers are made on machines not more than 80 inches wide; and that, while he did not know the grade of mesh used to produce the paper at bar, he did know that wrapping paper was made on the same machine and that finer papers require a closer mesh for a more even formation.

Sullivan stated further that plaintiff's exhibit 1 is not a bond paper and gave as his reasons the fact that the fibers inside the sheet, which is plaintiff's exhibit 1, are very long, comparatively, and widely dispersed, whereas, in a bond paper, owing to the longer beating period, the fibers are close and shorter; that bond paper has a lower finish, without the surfacing found in the exhibit; that bond paper is made of a better grade of pulp, is run more slowly on the machine, is made on a finer mesh, and more or less contains a watermark. He also averred that plaintiff's exhibit 1 is not a writing paper because it is not sufficiently hard sized; its cream color is more like that of a printing paper; it does not possess the requisite high opacity of a bond paper; and, although it takes pen-and-ink writing, it does not do so with the fineness to be found in plaintiff's illustrative exhibit 2, which the witness produced as a sample of bond paper. Actually, he stated, he does not know where one would draw the line between writing and printing papers, for the distinction evidences itself most particularly in the way the paper is produced.

It further appears from the testimony of this witness that the involved paper was made into small sales books, with printing, designed for department-store use, to be written on with a pencil, rather than with pen and ink.

For the defendant, Melvin L. McCreary testified that he is associated with the West Virginia Pulp & Paper Co., which manufactures sulphite bond, ledger and converting grades of paper, all types of printing papers, both coated and uncoated, unbleached kraft papers, corrugating papers, and heavy boards in the form of counters for shoes. The witness was first employed by this company in October 1936, upon his graduation from Juniata College, where, after majoring in chemistry, he received a bachelor of science degree. He went to the company initially as a chemist at its Williamsburg mill and served successively as assistant pulp mill superintendent, chief chemist, technical assistant to the manager, and manager of the Williamsburg Mill. Presently, and since May 1949, he is in charge of the sale of all book papers for the firm.

McCreary stated that he is familiar with merchandise such as plaintiff's exhibit 1, and has seen it made in his plant, although not with 100 percent sulphite pulp. Asked to give the characteristics of plaintiff's exhibit 1, he testified that it is a hard-sized sheet, entirely suitable for pen-and-ink writing, with a low opacity, indicative of a very low ash content, a machine finish; and that it has a rattle and snap, although there is a distinct difference between plaintiff's exhibit 1 and plaintiff's illustrative exhibit 2 in that respect. In his opinion, and based upon his experience, he considers plaintiff's exhibit 1 to be "a type of bond sheet."

The witness defined bond paper as hard sized, with a low percentage of ash, not over 6 or 7 percent, a consequent low opacity, a fairly high tearing strength, and a fairly good folding quality. These characteristics he found extant in both of the exhibits before the court; although he considered illustrative exhibit 2 to be superior to exhibit 1 in certain qualities. It has better color, and is adapted to purposes to which exhibit 1 would not be adapted. A typical test made in his company's mills to determine whether a sheet of paper is a good writing sheet, is to examine, under a glass, pen-and-ink writing for feathering. Feathering occurs when a sheet is not sufficiently surface-sized or beater-sized to prevent capillary attraction for ink. In his opinion, there is no feathering on either plaintiff's exhibit 1 or plaintiff's illustrative exhibit 2.

McCreary stated further that high-grade printing paper is paper with a uniform surface, a quality which has been brought about by the proper treating of the pulp. The pulp in most cases would not be a pure pulp. It would probably not be all long fiber, but rather mixed fiber, so that you would get a smooth surface, without voids. It would also contain a mineral filler, the percentage of which would vary from 9 or 10 to as high as 30. It does not have to be sized. It should have a relatively high opacity, higher than a bond sheet, and a lesser tensile strength than a bond sheet possesses. Standard size sheets of printing paper are 25 inches by 38 inches; the standard size for bond paper is 17 inches by 22 inches; and the size of the sheets at bar, namely, 22 inches by 34 inches, is twice the standard size for bond papers.

This witness was of opinion that exhibit 1 is not a printing paper. He would not accept a shipment of such paper as a good delivery on an order for printing paper, nor would he sell it as such, except with reservations and as a last resort. "I wouldn't sell it as a good printing sheet if I wanted to go back and make another sale." It would not be a very satisfactory printing sheet, for it does not have enough opacity for straight type and, while it would probably print all right for type printing or forms, it would not be successful for half-tone printing because the surface is not sufficiently level. He would call it "a low grade bond or tablet sheet," and although you can print on any writing paper and write on any printing paper, he would sooner sell it as a writing than as a printing paper.

This witness was further of opinion that neither the speed of a machine nor the width of the wire necessarily determined whether the paper produced was bond paper. In this connection, he explained that he knew of machines, some

150 inches wide, when run at a speed of 800 feet a minute, made a good grade of bond sold by a very reputable company in this country. He also thought that the formation in a bond sheet did not have to be nearly as good as the formation of a good printing sheet; that beating time did not determine the type or quality of paper produced, as there are easy beating pulps, in which class he included the pulp used in the merchandise at bar, and hard pulps, which require a longer. beating period; and that a poor-grade sulphite mash, run on a machine over 100 inches wide, at approximately 900 feet a minute, with a wide mesh and a resultant loose fibrous mash—a wide dispersal of the fibers—would, depending entirely on the way the machine was engineered, make a good bond sheet. He specifically denied the proposition that the wider the machine and the faster it runs, the poorer the grade of paper that emanates from it, and, based upon modern engineering, disagreed with the statement in the 1951 edition of the Encyclopaedia Britannica, volume 17, page 233, to the effect that mills making better class paper use machines up to 90 inches wide, and they make closer and more even sheets than do wider machines, but newsprint sheets are made up to 240 inches wide, running up to 1,200 feet a minute.

George J. Smart, called on behalf of defendant, testified that he is the eastern sales manager of Hammermill Paper Co., maker of Hammermill bond paper, and that he had been employed by that firm since 1934. He stated that he is completely familiar with the manufacture of all grades of Hammermill bond paper, including suphite bond; that writing paper and bond paper fall in the writing paper classification; that he would describe exhibit 1 as "a writing paper with bond paper characteristics." This witness defined bond paper as a paper that is suitable for pen and typewriting; which is sized sufficiently for good erasure; which has satisfactory strength characteristics, particularly in the area of tear, fold, tensile strength, and bursting strength; which is made of a long fiber, in open formation; which does not have the opacity generally found in a printing or book paper; and which does not have to be watermarked. He stated further that plaintiff's exhibit 1 seemed to possess all of those characteristics and that this was an opinion based upon his experience. Without an analysis of the sheet, he could not tell what fiber is in it, the strength of the fiber, or its Mullen strength, but he could attest to its lack of opacity, its appearance, its tearing strength, and its resistance to fold. He thought that it was well sized, because there is not any noticeable feathering of writing on the sheet; and that it has the type of formation you would expect to find in a bond type of writing paper.

Smart also testified that he has sold a great deal of printing paper; that he is familiar with the same; and that plaintiff's exhibit 1 is suitable for printing. It was his opinion that a person who completely understands the matter of furnish, machine operation, and the manufacturing process generally, and who had observed the manufacture of a given paper, would be in a better position to express a positive opinion as to the character of a paper than one expressing an opinion based upon observation of the sheet produced. However, given the ingredients and the type, speed, and width of the machine which made the instant paper, he believed a bond paper could be produced. Like the witness McCreary, Smart disagreed with the statement in the Encylopaedia Britannica concerning the width and speed of machines producing fine paper, on the basis of his own experience and the personal knowledge of two mills which produce very fine bond paper on machines 150 and 180 inches in width. Neither did he think it necessarily true that faster, wider machines made poorer qualities of paper. This witness concluded his testimony by stating that bond papers, writing papers, onionskin, manifold, typewriter, and record papers are writing papers as a general classification known in the trade, and that a sheet of paper, such as plaintiff's exhibit 1, could be and is sold within those classifying limits.

William A. Sullivan, called by the plaintiff to testify in rebuttal, stated that plaintiff's exhibit 1 is not any of the papers enumerated in paragraph 1407 (a) *supra.*

In weighing the evidence, we regard as of the utmost significance in this case the statement of defendant's witness Smart to the effect that one who completely understands the matter of furnish, machine operation, and the manufacturing process generally, would, if he had observed the manufacture of a given paper, be in a better position to express a positive opinion as to the character of that paper, than one who was basing his opinion upon observation of the sheet produced. To a great extent, this testimony corroborates that of plaintiff's witness Sullivan that the distinction between writing and printing papers evidences itself most particularly in the way the paper is produced.

The significance of this line of testimony lies in the fact that Sullivan, who had purchased the paper at bar, who had been in the paper business for 38 years, who had seen paper manufactured in Europe and in the United States during those years, and who was completely familiar with all phases of paper production, had actually observed the manufacturing processes which resulted in the paper here in issue. By admission of defendant's witness Smart, Sullivan's testimony is then entitled to greater weight than that of either McCreary or Smart.

It was Sullivan's considered and unequivocal opinion that plaintiff's exhibit 1 was neither a bond paper nor any of the papers enumerated in paragraph 1407 (a), *supra.*

In view of the foregoing observations and the court's own examination of plaintiff's exhibit 1, in the light of the general testimony concerning the characteristics and quality of bond papers, we are of opinion that the weight of the evidence favors the conclusion that the merchandise at bar is not bond paper.

In this as in all classification cases, plaintiff has a dual burden which must be sustained before a recovery may be had. *United States* v. *Gardel Industries,* 33 C. C. P. A. (Customs) 118, C. A. D. 325; *Joseph E. Seagram & Sons, Inc.* v. *United States,* 30 C. C. P. A. (Customs) 150, C. A. D. 227. Having established here that the collector had erroneously classified the merchandise as bond paper, plaintiff was next required to substantiate its contention that the paper was uncoated printing paper. This, in our opinion, has not been successfully accomplished.

The provision for uncoated printing paper is a designation of a kind of paper which is characterized by its use. *Clements Paper Company* v. *United States,* 29 Cust. Ct. 218, C. D. 1471. To find classification within the scope of this provision, a paper must be shown to be of a class or character which, as of the date of the passage of the Tariff Act of 1930, was chiefly used as printing paper. *United States* v. *C. J. Tower & Son,* 26 C. C. P. A. (Customs) 1, T. D. 49534. The instant record is barren of any testimony relating to the use of the class of paper to which the merchandise at bar belongs, either at the time of importation or at the time when the present tariff act became a law. Proof of use of the particular importation is not sufficient. *Katzenstein & Keene (Inc.)* v. *United States,* 14 Ct. Cust. Appls. 143, T. D. 41674.

We are, therefore, constrained to overrule the claim in the protest that the involved paper is uncoated printing paper. The decision of the collector in classifying said merchandise within the provisions of paragraph 1407 (a), *supra,* is affirmed, without being approved.

Judgment will be entered accordingly.