E. DILLINGHAM, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 88-01-00056

(Decided May 20, 1991)

*Fitch, King and Caffentzis (James Caffentzis),* for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, *(James A. Curley),* Civil Division, United States Department of Justice, *Chi Choy,* Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, of counsel, for defendant.

## OPINION

RESTANI, *Judge:* This case involves classification for tariff purposes of various kinds of writing and printing paper imported from Canada between 1984 and 1987. United States Customs ("Customs") classified the class of papers known as printing papers as coated printing paper under item 254.46, Tariff Schedules of the United States ("TSUS") and assessed a duty at either 4%, 3.5%, 3%, or 2.5% *ad valorem,* depending upon the date of entry. Customs classified the writing grades of paper as coated writing paper under TSUS item 254.56 and assessed a duty at either 4.9%, 4.7%, or 4.4% *ad valorem,* depending upon the date of entry. Plaintiff claims that Customs should have classified all of the papers as uncoated. The tariff provisions for such uncoated papers are item 252.67, TSUS (book and printing paper), and item 252.75, TSUS (writing paper). Item 252.67 is a duty free provision. Depending upon the date of entry, the rate of duty for item 252.75 is 3.3%, 2.9%, or 2.4% *ad valorem.*

This court has jurisdiction to hear this case under 28 U.S.C. § 1581(a) (1988).

## STATUTES INVOLVED

Customs classified these papers as

> Papers, impregnated, coated, surface-colored, embossed, ruled, lined, printed, decorated, or any combination thereof:

\*      \*      \*      \*      \*      \*      \*

Printing paper:
   Not lithographically printed:
\*     \*     \*     \*     \*     \*     \*

254.46      Other:

      Impregnated, coated, or both, but not otherwise treated
\*     \*     \*     \*     \*     \*     \*

Writing paper weighing over 18 pounds per ream:

254.56    Not lithographically printed . . . . . . . . . . . . . . . . . . . . . . . . .

Plaintiff claims that Customs should have classified the papers as:

Papers, not impregnated, not coated, not surface-colored, not embossed, not ruled, not lined, not printed, and not decorated:
\*     \*     \*     \*     \*     \*     \*

Printing papers:
\*     \*     \*     \*     \*     \*     \*

252.67    Book paper and printing paper, not specially provided for . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
\*     \*     \*     \*     \*     \*     \*

252.75    Writing paper weighing over 18 pounds per ream . . . . . . . .

## DISCUSSION

The parties have agreed that the imported papers are not surfaced-colored, embossed, ruled, lined, printed or decorated. The question before the court is whether or not the treatment imparted by manufacturer E.B. Eddy Forest Products, Ltd. ("Eddy") to the subject papers by means of a size press renders the papers at issue "coated." This, in turn, raises the essential question of the meaning of "coated" for tariff purposes.[1] "The meaning of a tariff provision is a question of law." *Arthur J. Humphreys, Inc. v. United States,* 15 CIT 191, Slip Op. 91–36 at 3 (May 3, 1991) (*citing Digital Equip. Corp. v. United States,* 889 F.2d 267, 268 (Fed. Cir. 1989)). "Whether a particular article fits within the meaning of a tariff term is a question of fact." *Id.* (*citing Brookside Veneers, Ltd. v. United States,* 6 Fed. Cir. (T) 121, 124, 847 F.2d 786, 788, *cert. denied,* 488 U.S. 943 (1988)).

### I. *Background and Definitions:*

In attempting to resolve this legal issue the court has resorted to various definitions of the word "coated." The first definition to be considered is that associated with the *Brussels Nomenclature. Brussels Nomenclature* "may be treated as legislative history to the tariff provisions where the language of the tariff provision and a *Brussels* section is

---

[1] Originally, this action comprised seventeen (17) entries, representing an equal number of different products. Defendant now agrees that Fabric Print W. S. paper, Entry No. 85–553599–5 is not coated, and is properly classifiable under item 252.67. This leaves sixteen (16) papers at issue.

very similar." *West Bend Co. v. United States,* 892 F.2d 69, 71–72 (Fed. Cir. 1989). Section 48.07 of the *Brussels Nomenclature* (1955) provides:

> Paper and paperboard, impregnated, coated, surface-coloured, surface-decorated or printed (not being merely ruled, lined or squared and not constituting printed matter within Chapter 49), in rolls or sheets.

Defendant claims that this language is sufficiently similar to that of TSUS items 254.46 and 254.56 to bring *Explanatory Notes to the Brussels Nomenclature,* vol. II, Section 48.07(C)(1) (1955), which explains the meaning of "coated paper," into play. The *Explanatory Notes* provide:

> **Coated paper and paperboard.** This description applies to paper or paperboard which has been given a coating on one or both sides either to produce a specially glossy finish or to render the surface suitable for particular requirements. Coating materials commonly used include: — barium sulphate, chalk, gypsum, zinc oxide, powdered metal, *kaolin (China clay),* textile dust, sawdust, granulated cork, *artificial resins,* cellulose nitrate, *pigments,* waxes, tar, glue, gelatin, *starch* and dextrin, shellac, albumen. Colouring materials are also frequently added to the coating medium.

[Emphasis added to highlight the materials added or allegedly added to the subject papers at size press.]

Even if this Note represents Congressional understanding of the term "coated," it does little to settle the question of whether the subject papers in this case are coated. There is no claim that these papers are "specially glossy." *Id.* Rather, the issue in this case is whether or not the subject merchandise has been coated "to render the surface suitable for particular requirements." *Id.* The "particular requirements" are not defined. Moreover, while the Note lists various coating agents, it does not explain in what manner or in what quantity one must apply them to constitute a coating or an agent which renders the surface suitable for particular requirements.

Various lexicographic sources were also called to the court's attention. The term "coated" is defined in *The Dictionary of Paper,* published by the American Paper Institute, as follows:[2]

> **Coated:** A term applied to paper and paperboard, the surface of which has been treated with clay or some other pigment and adhesive mixture, or other suitable material, to improve the finish with respect to printing quality, color, smoothness, opacity, or other surface properties. The term is also applied to lacquered and varnished papers.

American Paper Institute, Inc., *The Dictionary of Paper,* 95 (4th ed. 1980). Since experts on both sides agreed with this definition at trial, transcript ("tr.") at 132, 147–49, 201, the court accepts it as correct for

---

[2] The court admitted this definition into evidence as Defendant's Exhibit C.

purposes of items 254.46 and 254.56. This definition renders only limited assistance to the court, however. While it partially clarifies what is meant by "render[ing] the surface suitable for particular requirements," the definition is too vague for tariff classification purposes. It completely fails to answer the question of how and how much of the pigments are to be applied to achieve a particular suitability so that the relevant industry would accept the paper as coated. A partial resolution is found in Defendant's Exhibit G, *Pulp & Paper Dictionary,* which provides:

> **Coated:** (1) Various types of papers and paperboards that contain a *layer* of coating material such as clay, various pigments, and/or other special substances in combination with adhesive(s) of some type. Also, paper and paperboard treated with a surface layer of varnish or lacquer. These products are "coated" to improve their surface characteristics, e.g., opacity, smoothness, color, printing quality, etc.

J. R. Lavigne and K. L. Patrick, *Pulp & Paper Dictionary,* 150 (1986) (emphasis added). This indicates that to constitute a coating, sufficient coating material must be applied to constitute a layer.

Also of relevance is the existence of "film coated" paper. The *Pulp & Paper Dictionary* defines "film coated" as "[p]aper with a pigmented coating that is lighter than *normal*. It provides a more uniform and smoother surface." *Id.* at 218 (emphasis added). As indicated, the Dictionary's definition of "coated" does not establish what constitutes "normal." *The Dictionary of Paper,* at page 175, defines "film coated" as "[h]aving a coating lighter in weight than that on conventional coated papers. An example is the application of a lightly pigmented starch at the size press or calendar stack." It is undisputed that film coated paper is "coated." With this general background, the court turns to the specific process at issue.

In the papermaking process at issue, the paper sheet is initially formed from a liquid mixture to which is added a filler consisting of minerals which make the paper more opaque and thus more suitable for writing and printing purposes. The less opacity the paper possesses, the greater the problem of "show through."[3] In this case Eddy also adds rosin to the mixture for internal sizing. "Sizing gives writing paper the ability to keep watery ink from sinking into the paper and spreading." *Abitibi Price Sales Corp. v. United States,* 13 CIT 787, Slip Op. 89–138 at n.15 (Oct. 6, 1989) (citations omitted). The witnesses referred to the papermaking process at this stage as the "wet end." The mixture is then dried along a wire conveyer with the aid of suction. Finally, the dried paper is externally sized at the size press.

---

[3] "Show through" occurs when the printing or writing on one side of the paper is visible on the other.

II. *The Addition of Styrene Maleic Anhydride at the Size Press Does Not Constitute a Coating:*

Eddy treated some of the papers in question with styrene maleic anhydride (SMA) at the size press for external sizing. Plaintiff's expert witness, Mr. Willis Murphy, a forty (40) year veteran at Eddy and at time of trial its vice president of product development, testified that SMA was added to the papers to reduce the amount of rosin needed at the wet end. According to Mr. Murphy, rosin, while necessary for sizing, interferes with the bonding of the paper fibers. Tr. at 64–65. Customs has taken the position that the addition of SMA at the size press "coats" the paper, but defendant does not seriously argue this point in its post-trial brief.

It is uncontested that Eddy marketed all the papers at issue as uncoated papers and that at all times during the manufacture of the papers in question Eddy was known in the trade as a manufacturer which did not produce coated paper. Mr. Murphy testified that he supervised the removal of SMA from Eddy's process in August of 1985 due to Customs' position that SMA constituted a coating, and stepped up the internal sizing so that there would be no difference in the final product. Tr. at 65–66. The government failed to produce any testimony that use of SMA for sizing is a coating, and the evidence in its own dictionary exhibits indicates otherwise. The definitions do not refer to application of sizing agents as constituting a coating. Therefore, based on the lexicographic sources, industry understanding and marketing information the court concludes that the addition of only SMA at the size press does not constitute a coating.

III. *Plaintiff has Established that, as to Certain Grades of Paper, Only SMA was Added at the Size Press:*

Mr. Murphy testified that prior to August, 1985 he added SMA, but no pigments, such as clay or titanium dioxide, to certain papers at the size press. These papers include those known as Century Opaque Litho White, No. 1 Opaque Litho White, Edco Offset, Rampart Offset (also known as Jericho Offset), and Register and Press Register Bond.

Mr. Ira Reese, a chemist with Customs, disputed Mr. Murphy's testimony that no clay or titanium dioxide had been added to these papers at the size press. Tr. at 202. Using electron microscopy and x-ray fluorescence analysis, Mr. Reese concluded that these papers had been treated with minerals at the size press, but that Eddy had treated the two sides of the papers differently. He found that the manufacturer had treated one side of each paper with minerals, and the other side had either not been treated with any coating materials or had been treated to a lesser extent.

While the court finds Mr. Murphy's testimony to be credible, it finds problems with that of Mr. Reese, who was unable to hypothesize as to

228

why Eddy would be treating the two sides of these products differently.[4] This is a problem because there is no indication on the papers themselves as to which side has been coated,[5] and Mr. Reese admitted that a layman, not equipped with an electron microscope and x-ray machine, could not tell which side was so treated. Therefore, the court doubts that there would be any commercial value in treating the papers as Mr. Reese claimed they had been. Plaintiff claims that the minerals which Mr. Reese observed in x-ray fluorescence analysis were in fact from the filler added at the wet end. Mr. Reese testified that he had compensated for that possibility by using Fabric Print, Eddy's uncontestedly uncoated paper, as a baseline. First, all differences between Fabric Print and the paper at issue are not accounted for. Second, the court agrees with a statement of our predecessor court

> that one who completely understands the matter of furnish, machine operation, and the manufacturing process generally, would, if he had observed the manufacture of a given paper, be in a better position to express a positive opinion as to the character of that paper, than one who was basing his opinion upon observation of the sheet produced.

*Freedman & Slater, Inc. v. United States,* 31 Cust. Ct. 314, 318, Abs. 57622 (1953) (Customs mischaracterized the subject merchandise as bond paper, but plaintiff failed to prove its claimed classification). In this case, Mr. Murphy was thoroughly familiar with Eddy's manufacturing processes and supervised the production of the subject merchandise. His testimony appeared spontaneous and genuine.

The court concludes that there is no reason to disbelieve Mr. Murphy. Therefore, while the court begins with the presumption that Customs' classifications are correct, 28 U.S.C. § 2639(a)(1) (1988), it finds that plaintiff has met its burden of proving that the grades of papers which it claims were not treated with clay or titanium dioxide at the size press were not so treated and are thus legally classifiable as uncoated papers.

## IV. *Coating Requires the Creation of a New Paper Surface:*

Clay and/or titanium dioxide was added at the size press to the papers described as Vista Opaque White, Vista Opaque Cream White, Eddy Opaque 86, Volume Opaque White and Opaque Litho WT (Watchtower Opaque), thereby increasing the opacity of the papers. It is agreed that the papermaking industry regards clay and titanium dioxide as coating agents. The question is whether *any* external addition of these materials constitutes a coating or whether the materials must be applied in a certain way so as to achieve a certain effect before the paper will be considered coated. The thrust of Mr. Reese's testimony in this regard seemed to be that as long as the manufacturer has applied coating agents to the

---

[4] The court does not mean to imply fabrication, only that Mr. Reese's conclusions, while probably sincerely believed, do not outweigh other evidence to the contrary.

[5] This is hardly surprising, since Eddy denies that it treated either side of these papers with clay or titanium dioxide.

sheet after the wet end, then the paper is coated. He said that he did "not know of any coating standard that is available right now." Tr. at 280.

Plaintiff disputes Mr. Reese's definition of coated paper and states that these papers are uncoated because, according to Mr. Murphy, coating requires that a new surface be created, with the gaps in the paper web filled, by the addition of coating agents to the paper's surface via one of a number of devices which allow metering of the pigment to achieve even distribution.[6] Mr. Murphy did not disagree with *The Dictionary of Paper's* definition of film coating as one that may be applied at the size press, but testified that it requires at least two pounds per side per ream of material at the size press, and that he added at most 0.3 pound per ream to Eddy's paper. Tr. at 138. Thus, contrary to Mr. Murphy's expressed view, even he must conclude that metering is not essential to "coating." The court concludes, therefore, that "coated" in any common understanding refers to *what* has occurred, not to *where* something happens or how it happens in the process. Thus, both Mr. Murphy and Mr. Reese are in error as to the legal definition of "coated paper" for tariff purposes. What the court finds is essential to the creation of a "coated paper" is the creation of a new paper surface, the "layer" referred to in the *Pulp and Paper Dictionary,* in whatever manner such layer is created.

## V. *The Eddy Papers Do Not Have a New Surface:*

Mr. Murphy testified that he added at most 25 pounds of clay and/or titanium dioxide per ton of production at the size press. He did this because the sizing starch reduces opacity, and he wished to regain it. It is much more efficient to do this at the size press than at the wet end because the retention rate of clay at the wet end is 70%–75% and that for titanium dioxide it is only 50%–55%. Since retention rates at the size press are better than 95%, one need add much less pigment at the size press. Tr. at 67. Mr. Murphy testified that to give a weak coating acceptable to the industry he would have had to add 300 pounds of pigment per ton of production. Tr. at 78. Mr. Reese acknowledged that coated paper is generally sold in the market as "coated paper," tr. at 383, and that no one refers to Eddy's papers as "coated." Tr. at 386.

Presumably any new surface created by coating, even film coating, would be smoother and more uniform than the previous surface. *See Pulp and Paper Dictionary.* The photomicrographs which Mr. Reese made of the subject papers reveal a lack of smoothness or uniformity. This is not determinative, however, because something which is adequately smooth or uniform for commercial purposes, at a microscopic level may appear Himalayan. Defendant, however, introduced into evidence a paper, produced by a manufacturer which is not a party to this action, which Mr. Reese described as "light to medium" coated. Tr. at

---

[6] Such metering is not possible on the size press.

304. The photomicrographs appear very different from those of the Eddy papers. In contrast to the photomicrographs of the Eddy papers, the fibers of the "coated" product are not visible in the photomicrographs of the exemplar paper, except for a few fiber parts which have broken through. Eddy's coating agents do not hide the paper web to any significant degree.

On the other hand, defendant argues that it is not necessary that the surface be completely covered because the *Explanatory Notes to the Brussels Nomenclature* state that to be coated, a paper may be coated in whole or in part. It seems to the court that this misses the point, for the subject merchandise is not coated at all because the paper web remains visible through numerous voids. Moreover, plaintiff convincingly argues in its Reply Brief, at 3–4, that the Note refers to "spot coating," where only parts of the paper receive a new surface.

Finally, defendant argues that even if the subject merchandise is not "coated paper" within the trade, the TSUS refers to "paper * * * coated." In *Stiner & Son v. United States,* 2 Ct. Cust. App. 347, 349, T.D. 32079 (1911), the court held that even if plaintiff were correct in contending that certain post cards would not be recognized in the trade as "embossed cards," Customs did not err in classifying the subject cards as embossed because the Schedule referred to "cards * * * embossed" rather than to "embossed cards," and that the subject merchandise was embossed within the common meaning of the term, regardless of what special meaning "embossed cards" had in the trade. This argument does not aid defendant. Not only are the subject papers not known as "coated papers" within the industry, but, as discussed supra, they have not been subjected to coating within the context of the common industry understanding of the term as reflected in the dictionaries used in the industry and in the testimony of those familiar with the industry. The evidence reveals that the papers at issue did not receive a sufficiently contiguous added surface to be considered "coated" for tariff purposes.

### Conclusion

No dispute exists as to which of these papers are writing and which are printing papers. The only dispute in this case is whether or not the subject merchandise is coated. The court finds that the papers at issue are not the coated papers which Congress intended to be dutied at higher rates than uncoated papers. The court relies on the common and industry understanding of the relevant terms and the marketing of the papers at issue. As plaintiff has overcome the presumption that the papers at bar are coated, it has proven that its claimed classifications are correct. Customs will reliquidate the merchandise according to plaintiff's claimed classifications and will refund the excess duties paid, along with interest as required by law.